Docket No. 89796–Agenda 2–March 2002.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DAVID HARRIS, Appellant.

Opinion filed June 20, 2002.

JUSTICE FITZGERALD delivered the opinion of the court: Defendant, David Harris, was convicted of first degree murder and attempted armed robbery in 1995 and sentenced to death. On direct appeal, this court affirmed defendant’s conviction and sentence. 
People v. Harris
, 182 Ill. 2d 114 (1998). Defendant thereafter petitioned the Cook County circuit court for relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122–1 
et seq.
 (West 1998)). Defendant now appeals directly to this court the Cook County circuit court’s order dismissing his first and second amended post-conviction petitions without an evidentiary hearing. 134 Ill. 2d R. 651(a).

ANALYSIS

The Post-Conviction Hearing Act provides a procedural mechanism for a criminal defendant to assert that “in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both.” 725 ILCS 5/122–1 (West 1998); 
People v. Enis
, 194 Ill. 2d 361, 375-76 (2000); 
People v. Coleman
, 183 Ill. 2d 366, 378-79 (1998). A post-conviction proceeding is a collateral attack upon a prior conviction or sentence and does not relitigate a defendant’s innocence or guilt. 
People v. Evans
, 186 Ill. 2d 83, 89 (1999). Therefore, any issues considered by the court on direct appeal are barred by the doctrine of 
res judicata
, and issues which could have been raised on direct appeal are deemed waived. 
People v. West
, 187 Ill. 2d 418, 425 (1999).

After a capital defendant files a post-conviction petition, the trial court examines the petition and appoints an attorney to represent the defendant, if necessary. 725 ILCS 5/122–2.1(a)(1) (West 1998). Thereafter, the State may answer or move to dismiss the petition. 725 ILCS 5/122–5 (West 1998). If the State moves to dismiss the petition, the trial court must examine and rule upon the legal sufficiency of the defendant’s allegations, taking all well-pleaded facts as true. 
People v. Ward
, 187 Ill. 2d 249, 255 (1999). A defendant is not entitled to an evidentiary hearing unless the allegations of the post-conviction petition, supported by the trial record and any accompanying affidavits, make a substantial showing of a constitutional violation. 
People v. Orange
, 195 Ill. 2d 437, 448 (2001); 
Enis
, 194 Ill. 2d at 376. A trial court’s ruling on the sufficiency of defendant’s allegations is a legal determination and, therefore, our review is 
de novo
. 
Coleman
, 183 Ill. 2d at 388.

In this appeal, defendant raises eight issues. He contends: (1) he is actually innocent of the crime; (2) he received ineffective assistance of trial counsel because his lawyer failed to request a fitness examination; (3) he received ineffective assistance of trial counsel because his lawyer failed to adequately investigate the case and produce exculpatory evidence and alibi witnesses; (4) the State committed a 
Brady
 violation when it failed to disclose impeachment evidence regarding its witness Theodore Traylor; (5) the State committed a 
Brady
 violation at his capital sentencing hearing when prosecutors failed to disclose material exculpatory evidence regarding a disciplinary incident; (6) he received ineffective assistance of counsel at his capital sentencing hearing because his lawyer failed to perform a proper mitigation investigation; (7) he was not statutorily death eligible; and (8) the Illinois death penalty statute is unconstitutional.

I. Actual Innocence

Defendant argues that he is entitled to an evidentiary hearing on his claim that he is actually innocent of the crime for which he was convicted. Defendant’s claim of actual innocence is based upon the affidavits of codefendants Demetrius Daniels and Howard McClinton, who state that defendant was not present at the time of the crime and that they conspired to frame defendant. Defendant also bases his claim upon the affidavits of his brothers, Darrell and Rashid Harris, who state that defendant was at home with them in defendant’s basement apartment watching a movie at the time of the shooting.

Courts may consider a free-standing claim of actual innocence in a post-conviction proceeding if the claim is based on newly discovered, material, and noncumulative evidence that the defendant is innocent of the crime for which he has been tried, convicted, and sentenced. 
People v. Washington
, 171 Ill. 2d 475, 489 (1996). Newly discovered evidence is evidence that was unavailable at trial and could not have been discovered sooner through due diligence. 
People v. Burrows
, 172 Ill. 2d 169, 180 (1996). A defendant is only entitled to relief on his claim of actual innocence if the evidence is of such a conclusive character that it would probably change the result of retrial. 
Washington
, 171 Ill. 2d at 489; 
Burrows
, 172 Ill. 2d at 180.

We affirm the circuit court’s dismissal of defendant’s claim of actual innocence without an evidentiary hearing. First, the affidavits of defendant’s brothers, Darrell and Rashid, do not contain “newly discovered” evidence. This evidence could have been discovered before trial with the exercise of due diligence. Despite defendant’s contention that the evidence is newly discovered because the alibi affidavits are dated after the time of trial, the mere fact that these affidavits are dated after the time of trial does not render the evidence newly discovered. Clearly, the fact that defendant was allegedly with his brothers on the night of the crime could have been discovered sooner. More importantly, defendant is the source of this information and was armed with this information at the time of trial.

Turning to the affidavits of codefendants Daniels and McClinton, we also reject defendant’s claim of actual innocence based upon the evidence contained in these affidavits. In 1994, Daniels and McClinton gave statements to the police in which they outlined their involvement in the crime and identified defendant as the shooter. In their affidavits, however, they state that it was “a scheme to say that it was [defendant] who shot Clifford Chase in the event any of us were caught.” However, as we observed in defendant’s direct appeal, “evidence of guilt in this case was overwhelming.” 
Harris
, 182 Ill. 2d at 142. Defendant was convicted based upon the following evidence: defendant’s written statement in which he confessed to personally shooting the victim; the testimony of an eyewitness, Theresa Barnes, who identified defendant as the shooter; and the testimony of codefendant Theodore Traylor, who stated that defendant was the shooter. Importantly, the statements of Daniels, McClinton, Traylor, Barnes, and defendant describe in strikingly similar detail the circumstances of the crime. Based upon the overwhelming evidence of guilt, the affidavits of codefendants Daniels and McClinton are not of such a conclusive character that they would probably change the outcome on retrial. We affirm the decision of the circuit court dismissing this claim without an evidentiary hearing.

II. Guilt-Phase Issues

A. 
Strickland
–
Failure to Request a Fitness Hearing

Defendant argues that his trial counsel was ineffective for failing to seek a fitness hearing pursuant to section 104–11(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104–11(a) (West 1998)). Under section 104–11(a), “[t]he issue of the defendant’s fitness for trial, to plead, or to be sentenced may be raised by the defense ***. When a bona fide doubt of the defendant’s fitness is raised, the court shall order a determination of the issue before proceeding further.” 725 ILCS 5/104–11(a) (West 1998). Defendant argues that at the time of trial and sentencing there was a 
bona fide
 doubt of his fitness because he suffered from depression, a dependent personality disorder, and organic brain damage.

The State argues that defendant waived this claim because it could have been raised on direct appeal. See 
People v. Olinger
, 176 Ill. 2d 326, 365 (1997) (“argument is waived because it was apparent from a direct examination of the record and should have been raised on direct appeal”). The record on direct appeal contains defendant’s pretrial and presentence investigation reports. These reports state that in 1994, one year prior to his conviction and sentence in August 1995, defendant was diagnosed with depression and prescribed medication for a period of five months, to manage his depression.

Defendant, however, also relies on evidence outside the record on direct appeal, including psychological assessments gathered by his post-conviction counsel which conclude that defendant suffers from severe depression, dependent personality disorder, and organic brain disorder. Accordingly, to the extent defendant relies upon evidence outside the record, we examine this claim. Claims of ineffective assistance of counsel are examined under the two-prong test set forth in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Regarding the first 
Strickland
 prong, a defendant must prove that (1) counsel’s performance fell below an objective standard of reasonableness; and (2) absent counsel’s deficient performance there is a reasonable probability that the result of the proceeding would have been different. 
Evans
, 186 Ill. 2d at 93. Under 
Strickland
, reviewing courts entertain a strong presumption that the attorney’s performance was a product of sound trial strategy and professional judgment. 
Strickland
, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065; see also 
People v. Richardson
, 189 Ill. 2d 401, 414 (2000) (“Counsel’s decision whether to present a particular witness is generally a strategic choice which cannot support a claim of ineffective assistance of counsel”). To overcome this presumption, a defendant must demonstrate that his attorney’s performance fell below an objective standard of reasonableness, and that but for the attorney’s deficient performance the result would have been different. 
People v. Enoch
, 122 Ill. 2d 176, 202 (1988); see also 
People v. Stewart
, 104 Ill. 2d 463, 491-92 (1984) (“Effective assistance of counsel refers to competent, not perfect representation”). Regarding the second 
Strickland
 prong, a reasonable probability is a probability sufficient to undermine confidence in the outcome–or put another way, that counsel’s deficient performance rendered the result of the trial unreliable or fundamentally unfair. 
Enis
, 194 Ill. 2d at 376. To prevail, a defendant must satisfy both the performance and prejudice prongs of the 
Strickland
 test. 
People v. Sanchez
, 169 Ill. 2d 472, 487 (1996). If this court concludes that defendant did not suffer prejudice, the court need not decide whether counsel’s performance was constitutionally deficient. 
Evans
, 186 Ill. 2d at 94.

To establish that the failure to request a fitness hearing prejudiced a defendant within the meaning of 
Strickland
, a defendant must show that facts existed at the time of trial that would have raised a 
bona fide
 doubt of his ability “to understand the nature and purpose of the proceedings against him or to assist in his defense.” 725 ILCS 5/104–10 (West 1998); 
People v. Easley
, 192 Ill. 2d 307, 319 (2000). “Defendant is entitled to relief *** only if he shows that the trial court would have found a 
bona fide
 doubt of his fitness and ordered a fitness hearing if it had been apprised of the evidence now offered.” 
Easley
, 192 Ill. 2d at 319. To determine whether there exists a 
bona fide
 doubt of defendant’s fitness, a court may consider the defendant’s irrational behavior, the defendant’s demeanor at trial, and any prior medical opinion on defendant’s competence. 
Easley
, 192 Ill. 2d at 319; see also 
People v. Eddmonds
, 143 Ill. 2d 501, 518 (1991) (There are “ ‘no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated’ ”), quoting 
Drope v. Missouri
, 420 U.S. 162, 180, 43 L. Ed. 2d 103, 118, 95 S. Ct. 896, 908 (1975).

Taking as true defendant’s allegations that he suffers from mental impairments as they are stated in his post-conviction psychological assessments (see 
Coleman
, 183 Ill. 2d at 380-82), these allegations do not necessarily establish that defendant was unfit. 
Easley
, 192 Ill. 2d at 322-23. The issue is whether defendant could understand the proceedings and cooperate with counsel. 
Easley
, 192 Ill. 2d at 323. Specifically, we have stated that “[f]itness speaks only to a person’s ability to function within the context of a trial. It does not refer to sanity or competence in other areas.” 
Easley
, 192 Ill. 2d at 320, 322.

In this case, the record clearly illustrates that defendant understood the nature and purpose of the proceedings. On several occasions, the court provided defendant with a detailed explanation of the proceedings and informed defendant of his rights during those proceedings. Following these admonishments, defendant stated that he understood. Furthermore, the record shows that defendant participated in his own defense; communicated and conferred with his trial counsel; expressed to the court his understanding of the proceedings, including his decisions to litigate rather than agree to a plea, waive his right to testify, and waive his right to a jury at the sentencing hearing; and articulated a clear statement in allocution during mitigation.

Because defendant has not shown that there was a 
bona fide
 doubt concerning his fitness, defendant fails to make a substantial showing of ineffective assistance of counsel on this claim. The circuit court correctly dismissed defendant’s claim without an evidentiary hearing.

B. Strickland–Failure to Present Alibi and Exculpatory Evidence

Defendant asserts that even if this court rejects his claim of actual innocence, at the very least we should find that he received ineffective assistance of trial counsel because his attorney failed to investigate and present his alibi evidence that at the time of the shooting he was at home with his brothers. Defendant argues that his trial attorney’s deficient performance is the reason this evidence was not discovered before trial and presented in his defense.

We disagree. As we noted previously, defendant is clearly the source of this evidence and, yet, does not explain why he failed to inform his attorney about the existence of his alibi defense before trial. He cannot now blame his attorney for failing to investigate and discover this evidence. Moreover, given all of the evidence that was before the jury, defendant does not demonstrate that the result of the proceeding would have been different. We affirm the circuit court’s dismissal of this claim without an evidentiary hearing.

Defendant also contends that his trial counsel was ineffective because (1) he negligently failed to present evidence that codefendant Daniels was seen with a .38-caliber handgun, the same type of gun used to kill the victim, several days after the shooting, and (2) he negligently failed to present the testimony of assistant Cook County Public Defender Maura Shapiro, who would have advanced defendant’s claim that his post-arrest statements were coerced. We address each issue in turn.

The victim was shot to death in his car on June 7, 1993. Bullets were recovered from the front seat and the back floor of the victim’s car. At trial, the parties stipulated that an expert would testify that both of the bullets recovered from the victim’s car were fired from a .38 Special revolver. Prior to trial, defense counsel, Dennis Doherty, received an arrest report dated June 19, 1993, with information that codefendant Daniels was seen with a .38-caliber gun. The arrest report summary indicated that a Chicago Housing Authority security guard noticed Daniels holding a .38-caliber gun, that Daniels fled with the gun, but when he was apprehended several minutes later, he was no longer in possession of the gun. The gun was not recovered. In Doherty’s post-conviction affidavit, he states:

“My overall strategy was to establish a reasonable doubt that [defendant] had in fact shot Clifford Chase with a .38 handgun. In this connection, I had been tendered a police report relating to the subsequent arrest of a co-defendant who was observed *** to be in possession of a .38. I conducted no investigation based upon this report even though it obviously advanced my reasonable doubt defense ***. In fact, at the time of trial I overlooked the information altogether and never even considered it in terms of the defense that I did present. *** [T]his was not a strategic or tactical decision on my part.”

We conclude that the trial court correctly dismissed this claim without an evidentiary hearing because defendant fails to make a substantial showing of prejudice. See 
Eddmonds
, 143 Ill. 2d at 512. In the instant case, evidence against defendant was based, in part, upon the eyewitness testimony of Barnes, a disinterested bystander present in the parking lot at the time of the shooting, and Traylor, an individual present in the car with defendant before, during, and after the shooting. Evidence that a codefendant was seen with a similar model handgun, never recovered by the police, almost two weeks after the incident does not render the result of trial unreliable. Put another way, this evidence does not create a reasonable probability that the outcome of trial would have been different.

Next, defendant contends Doherty was ineffective for failing to call Assistant Public Defender Shapiro at trial. Defendant twice confessed to the crime, and the second time he memorialized his participation in the crime in a detailed, court-reported statement. These statements were offered as evidence at trial; however, defendant claimed that the police physically coerced his statements.

Turning to the time of his statements, on July 15, 1993, defendant was transferred from Judge Singer’s courtroom by the police to Area Two Police Headquarters for questioning. At that time, Assistant Public Defender Shapiro was assigned to Judge Singer’s courtroom and oversaw defendant’s transfer from the courtroom. Two days later, on July 17, 1993, defendant was returned to the Cook County jail with injuries to his lip and mouth.

At trial, the State called Assistant State’s Attorney Chiampas, the attorney who took defendant’s statement on June 15, 1993. Chiampas testified that when she took defendant’s statement he had no visible injuries. Additionally, the State presented the stipulated testimony of Officer Hughes, an Area Two officer who returned defendant to the lockup at 1:15 a.m. on June 16, 1993, after defendant made his statement. Officer Hughes provided in his stipulated testimony that when he returned defendant to the lockup, defendant had no visible injuries.

Defendant relies upon Doherty’s affidavit to support his claim that Shapiro’s testimony at trial would have advanced his defense that his statements were physically coerced:

“I never asked Ms. Shapiro about her practice in this case where a prisoner appears in court with obvious or even apparent injuries. This was a significant omission on my part because my defense at trial was predicated in part on the theory that [defendant’s] statement to authorities was coerced by physical violence. If Ms. Shapiro had not observed injuries to [defendant] *** on the date the police removed him from Judge Singer’s courtroom, this fact obviously would have bolstered our defense by eliminating the possibility that [defendant’s] injuries were pre-existing ones. *** The fact that Ms. Shapiro did not testify as a defense witness at trial was therefore not a tactical or strategic decision on my part.”

Defendant also attaches Shapiro’s affidavit to support his claim:

“If affiant observes a prisoner who appears in court with apparent injuries, she will make inquiry on the record concerning the matter. *** Based upon my experience as a public defender in Judge Singer’s courtroom, affiant also believes that Judge Singer would make similar inquiry of any prisoner who appears before him with apparent injuries. Long after June of 1993 affiant was contacted by attorney Dennis Doherty about a client of his named [defendant]. By this time affiant had no independent recollection of who [defendant] was.”

We find that defendant does not make a substantial showing of ineffective assistance of counsel based upon this evidence. The affidavits neither prove nor disprove defendant’s allegation that his statement was coerced. If called to testify, Shapiro could only have narrowed the time period in which defendant sustained his injuries, but her testimony could not identify the cause of defendant’s injuries. The testimony is, therefore, irrelevant and immaterial. Simply stated, the result of the proceeding would not have been different if Shapiro was called to testify at trial. The trial court correctly dismissed this claim without an evidentiary hearing because this evidence does not establish prejudice under 
Strickland
.

C. 
Brady Violation

Defendant argues that his constitutional right to due process was violated under 
Brady v. Maryland
, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963) when the State withheld exculpatory evidence. Specifically, defendant argues that the State failed to disclose evidence which would have impeached a State witness, Theodore Traylor.

Traylor testified that on June 7, 1993, a car occupied by Daniels, McClinton, Antoine Moore, and defendant pulled up next to him on the side of the road. Traylor accepted an offer of a ride home and got into the car. During the ride that followed, Daniels, McClinton, Moore, and defendant discussed carjacking. Eventually, the driver of the car pulled into a parking lot upon seeing an older man walking to his car. Traylor testified that the car pulled within several feet of the man, who was by this time seated inside his car. According to Traylor, Moore initially attempted the carjacking, but when the man refused to exit his car, Moore returned to the car and said, “Shoot him.” Traylor stated that defendant jumped out of the car and shot the man twice through the window. Subsequently, Traylor turned himself in and provided a handwritten statement describing the offense. Several weeks later Traylor enter into a plea agreement concerning an unrelated drug charge and was assigned to the Cook County probation department’s mental health unit for evaluation. Based upon his examination and reports from the Psychiatric Institute, a probation status report, dated July 28, 1993, indicated that Traylor “does not have a psychiatric disorder other than a polysubstance dependence.” This same report provided that Traylor “admitted to some thoughts about harming persons who [
sic
] he considered foes, because of street gang alliances.” Traylor was reassigned to an intensive drug probation unit.

In his post-conviction petition, defendant argues that the State failed to disclose impeachment evidence that Traylor was drug and alcohol dependent and that he admitted to having thoughts about harming people he considered gang rivals. Traylor’s drug conviction was disclosed to defendant at the time of trial, but psychiatric evaluations and probation recommendations concerning Traylor’s polysubstance dependence were not disclosed. This information was reported in a Cook County adult probation department status report. Defendant argues that the information directly impacted Traylor’s ability to recall, recollect, and narrate events and, therefore, it was impeachment evidence. Moreover, defendant argues that the information concerning Traylor’s harmful thoughts about gang rivals also was impeaching because it exposed Traylor’s motive to testify falsely. Defendant claims that the evidence was known to the State because the Cook County State’s Attorney’s office was involved in the proceedings that eventually resulted in Traylor’s drug charges and was a party to Traylor’s plea agreement. In response, the State only argues that the evidence is not material or sufficient to cast doubt upon the verdict. The State does not dispute that it knew of this evidence and did not disclose it, and we confine our analysis to the issue of materiality.

As stated by the United States Supreme Court in 
Brady
, the prosecution must disclose evidence that is favorable to the accused and “material either to guilt or to punishment.” 
Brady
, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1197; see also 134 Ill. 2d R. 412(c); 
Sanchez
, 169 Ill. 2d at 485-86. Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. 
Kyles v. Whitley
, 514 U.S. 419, 434, 131 L. Ed. 2d 490, 506, 115 S. Ct. 1555, 1566 (1995); 
United States v. Bagley
, 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985); see also 
Sanchez
, 169 Ill. 2d at 486 (“the standard for materiality under 
Brady
 is whether there is a reasonable probability that disclosure of the evidence to the defense would have altered the outcome of the proceeding”). However, under this test courts of review do not examine the sufficiency of the evidence. 
Coleman
, 183 Ill. 2d at 393. Rather, a defendant must show that “ ‘the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.’ ” 
Coleman
, 183 Ill. 2d at 393, quoting 
Kyles
, 514 U.S. at 435, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566. Impeachment evidence may be considered material to guilt. 
Giglio v. United States
, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 108, 92 S. Ct. 763, 766 (1972).

In this case, defendant does not make a substantial showing of a constitutional violation under 
Brady
. Taking the allegation that the State failed to disclose evidence of Traylor’s polysubstance abuse as true, this evidence is not material under 
Brady
. Specifically, defendant fails to show that there is a reasonable probability that had the evidence of Traylor’s polysubstance dependency been disclosed, the result of the proceeding would have been different. The evidence allegedly withheld was merely cumulative of other evidence presented at trial which challenged Traylor’s credibility. See 
People v. Cloutier
, 191 Ill. 2d 392, 400-01 (2000) (finding no 
Brady
 violation where the evidence allegedly withheld was merely cumulative of other evidence presented at trial). For example, Traylor offered evasive answers concerning his prior conviction. On direct examination, evidence was introduced concerning his prior conviction for possession with intent to deliver. Traylor then stated on cross-examination that he just happened to be walking down the street and found a bag of “dope” and was innocent of the drug crime for which he pleaded guilty. Further, Traylor offered evasive answers concerning his occupation. He stated that he did not sell drugs, but rather made his living selling candy for his church. Later, Traylor offered that he frequently traveled, not with money from his occupation, but rather with money paid to him by lawyers for “filing” lawsuits. Last, Traylor provided evasive answers concerning his presence in the area on the night of the crime. On cross-examination, Traylor stated that he was in the area on the night of the crime to watch a person to pay off his debt to a drug dealer. Subsequently, Traylor stated that he was in the area to pay a drug dealer money he owed. Traylor finally offered that he was in the area to pay a “gambling debt.” Therefore, it is unlikely that additional evidence challenging Traylor’s credibility would have altered the outcome of the proceeding.

Moreover, defendant fails to make a substantial showing that evidence concerning Traylor’s harmful thoughts about gang foes is material to guilt. The adult probation department status report noted that Traylor “admitted to some thoughts about harming persons who [
sic
] he considered foes, because of street gang alliances.” Defendant claims that this evidence exposes Traylor’s motive to testify against him. We disagree. There is nothing to suggest that this alleged statement was directed toward defendant. Defendant does not offer evidence that he and Traylor were in rival gangs. Defendant does not offer evidence that Traylor considered defendant a “foe.” In fact, the record belies this assertion. For example, the status report states that Traylor “admits that most of his friends are active gang members and sell drugs, but denies any [personal] gang affiliation or drug dealing.” Moreover, after conversing with defendant and his companions in the car on the night of the crime, Traylor accepted a ride home in the car with defendant. Thus, defendant fails to make a substantial showing that Traylor’s alleged statement illustrates a motive to testify against him. If this evidence had been disclosed to the defense, there is no reasonable probability that the result of the proceeding would have been different.

III. Sentencing-Phase Issues

A. 
Brady
 
Violation

Defendant argues that the State also violated its duty under 
Brady
 during the aggravation/mitigation portion of the capital sentencing hearing. 
Brady
, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. First, defendant argues that the State knowingly presented false or misleading testimony.

On May 28, 1995, Cook County department of corrections officer Donnie Booker was temporarily assigned to division one, tier C-2, in response to a riot. During his search of the tier, he discovered a two-foot-long homemade knife hidden beneath a bed mattress upon which defendant was asleep. Officer Booker submitted a disciplinary report, and on May 30, 1995, defendant received 29 days in isolation for this violation. Officer Booker testified about his discovery of the homemade knife during the aggravation portion of the sentencing hearing.

“ASSISTANT STATE’S ATTORNEY: And while you were on tier 2 that afternoon, did you recover anything?

BOOKER: Yes, sir, I did, I recovered a homemade knife, about two feet long.

Q. And, was that from cell C-14?

A. Yes, it was.

Q. And did you learn whose cell that was?

A. Yes, I did.

Q. And where did you recover that two foot long homemade knife, where did you recover it from?

* * *

A. I got it out of cell 14, it was right in the guy’s, inmate’s mattress, and I pulled it out of his mattress stuffed inside.

* * *

Q. Now did you learn whose, who slept on that mattress?

A. Yes, I did.

Q. Who is that?

A. I know it’s [defendant].”

The department of corrections’ internal affairs division conducted an investigation following the incident to determine whether prosecution for possession of contraband in a penal institution was warranted. Investigators interviewed Officer Booker in connection with the investigation and prepared a written summary.

“Officer Booker said that the weapon was hidden inside the bed mattress of the bed that 
[defendant]
 *** was sleeping on ***. ASA Stephenson asked Officer Booker if he knew if 
[defendant]
 was assigned to cell 14? Officer Booker said that he assumed that 
[defendant]
 was assigned to cell 14 but was not positive. Reporting Investigator obtained a copy of the tier sheet which indicated that 
[defendant]
 was assigned to cell 10.”

On June 10, 1995, investigators closed the case and declined to approve the filing of criminal charges for the incident, and instead reported that because defendant was assigned to cell 10, but not cell 14, “[i]t would be difficult to prove exclusive possession.” Investigators memorialized their decision in a “Cook County Sheriff’s Police Department Offense/Incident Report.” This report was never disclosed to the defense.

Defendant claims that knowledge of the investigators who compiled the offense/incident report is imputed to the trial prosecutors and, therefore, the trial prosecutors committed a violation under 
Brady
 when they failed to correct Officer Booker’s “misleading” testimony.

The 
Brady
 rule applies to three general situations where the State has an affirmative duty to disclose favorable evidence to a criminal defendant. 
Coleman
, 183 Ill. 2d at 391. In the first instance, a 
Brady
 violation occurs if undisclosed evidence demonstrates that the prosecution knew or should have known that its case included 
perjured
 testimony. 
Coleman
, 183 Ill. 2d at 391-92, citing 
Agurs
, 427 U.S. at 103, 49 L. Ed. 2d at 349-50, 96 S. Ct. at 2397. Under this circumstance, courts examine the alleged violation under a “strict standard of materiality” and the “conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.” 
Coleman
, 183 Ill. 2d at 392, citing 
Agurs
, 427 U.S. at 103, 49 L. Ed. 2d at 349-50, 96 S. Ct. at 2397. Defendant argues that the strict standard of materiality applies. We disagree because the instant matter does not concern 
perjured
 testimony.

In 
Coleman
, a witness testified regarding her identification of the defendant at a lineup. Although she did not positively identify the defendant at the lineup, she testified that the defendant “ ‘could have been’ ” the individual she saw leave the murder scene because the defendant resembled the individual’s “ ‘height, physical build, and complection [
sic
].’ ” 
Coleman
, 183 Ill. 2d at 395. However, the witness explained in an affidavit attached to the defendant’s post-conviction petition that the assistant State’s Attorney “pressured” her to identify the defendant as the gunman at trial. She stated that prior to her lineup identification she informed the assistant State’s Attorney that the individual “ ‘didn’t look like the guy I saw’ ” and was “ ‘not dark enough to be the guy.’ ” (Emphasis omitted.) 
Coleman
, 183 Ill. 2d at 395. However, the prosecution never disclosed the statement that she was uncertain about her identification. We reversed the circuit court’s dismissal of the defendant’s 
Brady
 claim and remanded the issue for an evidentiary hearing.

Conversely, in the instant matter, there is no evidence that the State’s case included perjured testimony. Unlike 
Coleman
, Officer Booker’s testimony was consistent with his limited knowledge of the incident. He was assigned to division one, tier C-2, for a limited search following a riot lockdown and was not necessarily familiar with the particular inmate cell assignments. Further, the record shows that defendant never informed Officer Booker that he was sleeping in a different cell. Last, Officer Booker’s testimony is corroborated by the investigative report, which states that “Officer Booker assumed that Harris was assigned to Cell 14.” There is no information contained in the record to suggest that Officer Booker knew, or later learned before he testified during aggravation, that Harris was assigned to a different cell. Defendant does not show that the State’s case during aggravation included perjured testimony.

Defendant further argues, however, that the State’s failure to tender the offense/incident report constitutes a 
Brady
 violation because the evidence would have carried weight in mitigation to rebut the State’s argument that defendant lacked rehabilitative potential. When the defense makes a pretrial request for specific evidence, or makes either no discovery request or only a general request for “
Brady
” material, and exculpatory evidence is withheld by the State we must examine whether the suppression “ ‘ “undermines confidence in the outcome” ’ ” such that “ ‘the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence’ ” in the sentence. 
Coleman
, 183 Ill. 2d at 393, quoting 
Kyles
, 514 U.S. at 434-35, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566.

In aggravation, the State presented testimony of five department of corrections officers. Officer King testified about an incident occurring on November 11, 1993, when defendant was observed jumping from cell to cell. Defendant was cited for two violations: being in an unauthorized area and interfering with the prisoner count. Officer Brown testified that on May 11, 1994, he found a six-inch homemade knife in defendant’s mattress. Defendant received 20 days in isolation. Officer Brown also testified that on April 9, 1995, he discovered defendant on the wrong tier. Defendant responded to Officer Brown’s inquiries with profanities, and defendant received 10 days in isolation for the violation. On August 17, 1994, during a routine check of defendant’s cell, Officer Adorjan discovered a nine-inch homemade knife inside an envelope located underneath defendant’s bed. As a result, defendant received 10 days in isolation. On September 14, 1994, Lieutenant Torres intervened in a fight between defendant and another inmate. When Lieutenant Torres arrived to stop the fight, he saw defendant with a seven-inch homemade knife in his hand. Defendant received 29 days in isolation. Based upon the State’s overall presentation of testimony regarding these various incidents, we can reasonably conclude that Officer Booker’s testimony regarding his discovery of a two-foot homemade knife in defendant’s presence was immaterial to the result of the sentencing hearing.

B. 
Strickland – Failure to Investigate or Present Mitigating Evidence

Next, defendant claims that his trial counsel, Doherty, was ineffective during the capital sentencing hearing because he failed to investigate and present evidence in mitigation. He argues that Doherty’s ineffective representation denied a meaningful assessment of the appropriateness of the death penalty. Defendant asks this court to grant him a new sentencing hearing or, at a minimum, order the circuit court to conduct an evidentiary hearing on this issue.

Defendant’s sentencing hearing lasted one day. In aggravation, the State presented the victim impact testimony from the victim’s two daughters and widow; evidence concerning two prior carjackings performed by defendant in the five days before the murder; evidence regarding defendant’s prior drug offenses; disciplinary violations occurring at the Cook County jail during his incarceration, including several instances involving homemade knives; evidence concerning defendant’s gang affiliation and his position within the gang; and testimony from the assistant State’s Attorney that defendant was “cool, calm, and collected” during her interrogation and his subsequent statement.

Conversely, in mitigation Doherty submitted 17 letters from defendant’s family and friends. Defendant’s sister collected these letters from family and friends without Doherty’s instruction or assistance. These letters discussed defendant’s childhood, family, capacity for good grades, and devotion to religion. The letters did not request leniency, but consistently stated:

“I like to start off by saying I am a tax paying citizen and by that token [defendant] is a waste of tax paying citizen money. I say this because I know he is innocent, no doubt about it.

* * *

[Defendant] went to school and got very good grades like he was suppose [
sic
] to. He played with the children in the neighborhood. [Defendant] was a quiet person who loved people. I just don’t believe [defendant] committed such an offense as hurting someone or killing someone. *** [Defendant] shouldn’t have to do the time if he didn’t do the crime. I think [defendant] took the blame or got framed.

 * * *

It is my strong belief, as God as my witness, [defendant] did not commit this offense. He was wrongfully accused and convicted of committing this offense, despite the overwhelming evidence to support his innocence. The prosecutorial arguments weren’t convincing enough to link him to this crime.”

After Doherty submitted the letters to the court, he presented a short argument in mitigation, during which he quickly discussed defendant’s troubled childhood and summarized the letters:

“MR. DOHERTY: I won’t recite from the rest of the letters, judge, but they are all similar in that fashion, that he got good grades in school, he was growing up all right, was given religion and then was led astray by the gang.

THE COURT: Mr. Doherty, I just want you to know if you want to quote from any of those letters, you go ahead and do it, you take whatever time you need to present whatever you want to present, don’t feel that you’re being rushed because you’re not going to be rushed at all.

MR. DOHERTY: No, no, no, I know your Honor would allow, and I sincerely believe that ***.”

Defendant argues that if Doherty had reviewed pretrial investigation reports, and performed even minimal investigation, he would have learned that defendant suffered from severe depression, dependant personality disorder, and organic brain disorder. Defendant also argues that Doherty failed to investigate and present evidence concerning his personal and family history, including the history of drug and alcohol abuse, emotional neglect and possible physical abuse. Finally, defendant maintains that Doherty failed to present evidence regarding his rehabilitative potential to rebut the State’s evidence of future dangerousness. To support his claim, defendant relies upon Doherty’s affidavit wherein Doherty admits that he negligently failed to investigate or present evidence in mitigation:

“I never seriously considered that his case was a death penalty case in the sense that it ever occurred to me that a death sentence might actually be imposed.

* * *

I never investigated David’s case to develop evidence for purposes of a capital sentencing hearing. My failure to investigate was not based on facts that led me to conclude no investigation was necessary, to the contrary, my failure to investigate was based entirely upon my own feeling that David’s case didn’t merit imposition of the death penalty, and that I hadn’t received any ‘signals’ to the contrary. In short, my failure to investigate this aspect of David’s case was neither a strategic nor a tactical decision.”

Furthermore, defendant relies upon a mitigation report from Marylynne Kaplan, a licensed forensic social worker; a psychological assessment report by Dr. Harry Gunn, Ph.D.; a neuropsychological assessment report by Dr. Johnathan Hess, Ph.D; a risk assessment report by Dr. Mark Cunningham, Ph.D., a forensic psychologist; psychiatric records from the Cook County department of corrections’ Cermak Health Services; psychiatric records from the Illinois Department of Corrections; an affidavit from defendant’s sister, Susie Harris; school records from the Chicago board of education and Sullivan House High School; and a copy of a Gangster Disciples organizational chart used as a government exhibit in federal litigation.

“In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.” 
Strickland
, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. The standard to determine whether a defendant received ineffective assistance of counsel at a capital sentencing hearing is governed by the 
Strickland
 standard. 
Coleman
, 183 Ill. 2d at 403. In order to establish ineffective assistance of counsel a defendant must show that “counsel’s performance fell below minimal professional standards and that a reasonable probability exists that the sentence was affected by the poor performance.” 
People v. Steidl
, 177 Ill. 2d 239, 257 (1997), citing 
Orange
, 168 Ill. 2d at 168; 
People v. Caballero
, 126 Ill. 2d 248, 259-60 (1989); 
People v. Perez
, 148 Ill. 2d 168, 186 (1992). Generally, courts of review are deferential of trial counsel’s decisions regarding the presentation of evidence in mitigation. 
Steidl
, 177 Ill. 2d at 257. However, deference is not warranted if counsel’s failure to present evidence is due to his or her failure to investigate. 
Steidl
, 177 Ill. 2d at 257; see also 
People v. Ruiz
, 177 Ill. 2d 368, 385 (1997) (“where counsel has neglected to conduct a proper investigation into mitigating circumstances, the failure to introduce mitigating evidence cannot be attributed to strategy”), quoting 
People v. Coleman
, 168 Ill. 2d 509, 535 (1995).

In 
Steidl
, we considered a defendant’s claim that his counsel was ineffective at the sentencing hearing for failing to prepare and present sufficient mitigation evidence. 
Steidl
, 177 Ill. 2d at 257. Defense counsel indicated that based upon the defendant’s lack of a serious criminal history, and his belief that it was unlikely that defendant would get the death penalty, he did not prepare for the sentencing hearing. We held that defense counsel’s failure to “conduct even a minimal investigation into possible mitigation evidence raises serious questions as to the effectiveness.” 
Steidl
, 177 Ill. 2d at 258-59. In 
Steidl
, defense counsel’s serious inaction constituted deficient performance, and the lack of evidence offered in mitigation prejudiced defendant.

Similarly, in this case defendant argues that Doherty was woefully unprepared for the capital sentencing hearing because he did not consider defendant a serious candidate for the death penalty. Doherty’s failure to present evidence in mitigation was not a strategic choice, but rather an omission due to his own lack of preparation. Doherty’s failure to investigate and present evidence in mitigation produced an unreliable and unjust result. He failed to investigate potential sources of mitigation clearly contained in the pretrial investigation report. The pretrial report indicates that defendant was treated for depression in 1994 and prescribed psychotropic medicine for a period of five months before he refused to continue treatment. The pretrial report states that defendant consumed a pint of hard liquor and a half ounce of marijuana on a weekly basis. Doherty failed to make even initial inquiries into these matters. Furthermore, although defendant denied a history of physical or emotional abuse, the pretrial report indicated that he described his childhood as “rough.” Again, Doherty never investigated or contacted individuals regarding this potential mitigating evidence. See 
People v. Morgan
, 187 Ill. 2d 500, 544-45 (1999) (the duty to investigate is “not limited to matters about which defendant has informed defense counsel” or “lessened by the lack of the specificity of information conveyed”).

Therefore, we consider whether a reasonable probability exists that defendant’s sentence was affected by the poor performance. In so doing, we take into account the extent of the evidence in mitigation, as well as aggravation. 
Coleman
, 168 Ill. 2d at 538. In this case, evidence regarding defendant’s depression, dependent personality disorder, organic brain damage and social background may have explained the aggravating evidence presented by the State and, more importantly, defendant’s actions at the time of the crime. Particularly, the post-conviction exhibits suggest that defendant suffers from dependent personality disorder. Several individuals, including defendant’s former academic advisor and one expert concluded that defendant is a “follower not a leader,” “easily led by his peers,” “unwilling to make decisions without assistance from others,” “in constant need of approval,” “insecure,” “an unwise follower,” and “suffers from massive dependency.”

Additionally, a review of the sentencing transcript reveals that the trial judge was influenced by the lack of mitigation evidence:

“I started out with the feeling that I would attempt to look at everything in the best eye possible to find something mitigating in Mr. David Harris.

* * *

I was listening to the arguments of the defense saying, you know that David had this problem where three people died in his family, and then he had no role models ***.

* * *

I am suppose to think that David Harris acted this way only because somebody else told him, I don’t think so. I think that David Harris acted on his own volition.”

These comments clearly reveal a connection between the judge’s imposition of the death penalty and Doherty’s failure to present any mitigating evidence. We cannot say that the mitigation evidence contained in the post-conviction record could not have altered the determination that there was no evidence that mitigated against the imposition of the death sentence. Doherty’s deficient performance, and the weight of the missing evidence in mitigation, make a substantial showing that Doherty’s performance constituted ineffective assistance of counsel. Doherty’s failure to investigate and present evidence in mitigation may have so undermined the proper function of the adversarial system as to have produced an unjust result and raises serious doubts regarding the propriety of defendant’s sentence. See 
Morgan
, 187 Ill. 2d at 557 (“The court must scrutinize and remain vigilant in determining whether the proceedings are unreliable because of a breakdown in the adversarial process”). Accordingly, we reverse the circuit court’s dismissal of the defendant’s petition on this ground and remand for an evidentiary hearing on defendant’s allegations.

Defendant requests that this court remand the matter for a new sentencing hearing, rather than remand the matter to the circuit court for an evidentiary hearing. Although the record clearly makes a showing that Doherty’s performance was deficient and that his performance, or lack thereof, prejudiced defendant, we decline to grant a new sentencing hearing absent an evidentiary hearing. The circuit court, in the context of an evidentiary hearing, offers the more appropriate forum to address Doherty’s alleged ineffective representation. This is true because, although there is no evidence that Doherty willfully committed reversible error, a court should be critical of conduct designed to disrupt the appropriate administration of justice. Thus, while counsel is obligated to admit that he or she negligently represented a defendant, his or her obligation does not end with the filing of an affidavit. The State has the right to attack the factual basis of the affidavit, and one method to attack the credibility of an affidavit is through cross-examination during the course of an evidentiary hearing. This ensures that counsel, in their zeal to advocate for their client, do not betray their obligation to the court. For this reason, we decline to grant defendant a new sentencing hearing absent an evidentiary hearing.

IV. Death Eligibility

Defendant was convicted of first degree murder and attempted armed robbery and found eligible for the death penalty based upon his commission of murder in the course of another felony. 720 ILCS 5/9–1(b)(6) (West 1994). Defendant argues that under the facts of this case he did not qualify for the offense of attempted armed robbery (720 ILCS 5/8–4 (West 1994)) and, therefore, his sentence of death violates the due process clauses of the United States and Illinois Constitutions.

In support of his claim, defendant argues that he was indicted for the offenses of murder and attempted armed robbery in November 1993. However, on August 13, 1993, the legislature amended the Criminal Code of 1961, and the robbery statute was amended to exclude the taking of a “motor vehicle” as conduct constituting the offense of robbery. Pub. Act 88–351, §5, eff. August 13, 1993. At the same time, the legislature created the new offense of aggravated vehicular carjacking (720 ILCS 5/18–4 (West 1994)). At trial, defense counsel stipulated that defendant was eligible for the death penalty based upon his convictions of attempted armed robbery and murder. Further, this court stated on direct appeal that “defendant’s convictions for attempted armed robbery formed the basis for the trial judge’s subsequent determination, under section 9–1(b)(6) of the Criminal Code of 1961 [citation], that the defendant was eligible for the death penalty.” 
Harris
, 182 Ill. 2d at 134. Thus, there is no dispute that defendant was found eligible for the death penalty based upon section 9–1(b)(6).

Defendant alleges that his appellate counsel was ineffective for failing to raise this issue on direct appeal. See 
People v. Caballero
, 126 Ill. 2d 248, 269-70 (1989). For this reason, we reject the State’s argument that this claim is waived and we will address the merits of defendant’s claim.

A claim of ineffective assistance of appellate counsel is examined under the 
Strickland
 test. 
Caballero
, 126 Ill. 2d at 269-70. Defendant must show that his appellate counsel’s failure to raise the issue on appeal was objectively unreasonable and that the decision prejudiced him. 
Enis
, 194 Ill. 2d at 377; 
People v. Flores
, 153 Ill. 2d 264, 283 (1992). As a general rule, we accord appellate counsel’s decision whether or not to pursue issues on appeal substantial deference. 
People v. Mack
, 167 Ill. 2d 525, 532-33 (1995). Defendant does not suffer prejudice under 
Strickland
 unless the underlying issue is meritorious. 
Easley
, 192 Ill. 2d at 329.

This court has stated that the law in effect at the time of the offense governs unless there is “ ‘an express statutory provision stating an act is to have retroactive effect.’ ” 
People v. Davis
, 97 Ill. 2d 1, 22-23 (1983), quoting 
Village of Wilsonville v. SCA Services, Inc.
, 86 Ill. 2d 1, 18 (1981). Defendant argues that he was not indicted until November 1993, after the August 13, 1993, amendment to section 9–1(b)(6). The record contradicts his assertion. Defendant was indicted for first degree murder and attempted armed robbery on July 23, 1993. Defendant was reindicted in November 1993, but only to add codefendant Moore to the indictment. Defendant was indicted under section 9–1(b)(6) before the amendment. The legislature did not express its intention to make the amendment to section 9–1(b)(6) retroactive, and, therefore, it could only be applied prospectively. Defendant’s claim is nonmeritorious. Thus, defendant’s claim that he received ineffective assistance of appellate counsel is without merit.

V. Constitutionality of the Illinois Death Penalty

As his final argument, defendant contends that the Illinois death penalty statute (720 ILCS 5/9–1 (West 1998)) is unconstitutional based upon the United States Supreme Court decision in 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), because it does not require the sentencer to find beyond a reasonable doubt that there are no mitigating factors sufficient to preclude a death sentence.

In 
People v. Ford
, 198 Ill. 2d 68, 74 (2001), we stated that “
Apprendi
 requires that only those facts that increase the penalty for a crime 
beyond the prescribed statutory maximum
 be proved beyond a reasonable doubt.” (Emphasis in original.) The consideration of mitigating factors does not concern enhancement of defendant’s sentence because once a defendant is found eligible for the death penalty, the prescribed statutory maximum is death. See 
Ford
, 198 Ill. 2d at 74-75. Thus, defendant’s argument does not implicate 
Apprendi
. The defendant cannot raise this nonmeritorious constitutional issue in a post-conviction context.
(footnote: 1) See 
People v. Rogers
, 197 Ill. 2d 216, 224 n.3 (2001). Accordingly we reject defendant’s final claim.

CONCLUSION

For the reasons we have discussed, we affirm in part, and reverse and remand in part. We reverse the circuit court’s dismissal of defendant’s claim of ineffective assistance of trial counsel based upon trial counsel’s failure to investigate and present evidence in mitigation, and direct the circuit court to conduct an evidentiary hearing on this issue.

Affirmed in part and reversed in part;

cause remanded with directions.

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that the circuit court erred when it dismissed, without an evidentiary hearing, Harris’ claim that his trial counsel was ineffective for failing to investigate and present evidence in mitigation. I write separately because I would go beyond the majority’s disposition and hold that Harris is entitled to immediate post-conviction relief. Regardless of the outcome of any further proceedings on remand, Harris’ convictions and sentences cannot stand. That is so because he was tried, convicted and sentenced under a system of capital punishment that is fatally defective.

Our court has now adopted a comprehensive set of new rules governing the conduct of cases in which the State is seeking the death penalty. For the reasons set forth in my dissenting opinion in 
People v. Hickey
, No. 87286, slip op. at 34-37 (September 27, 2001) (Harrison, C.J., dissenting), the procedures contained in those rules are indispensable for achieving an accurate determination of innocence or guilt and are applicable to all capital cases now coming before us on review. Whether the new rules will be sufficient to place this State’s capital punishment system within the tolerances permitted by the State and federal constitutions is a question we cannot yet answer. It is clear, however, that no proceeding conducted without the benefit of those rules can be deemed reliable. As a result, remanding for further proceedings on Harris’ petition is unnecessary. Rather, we should grant Harris relief on the merits, set aside his convictions and sentence of death, and order that he be granted a new trial without further delay.

JUSTICE McMORROW, also concurring in part and dissenting in part:

I agree with the majority that defendant has made a substantial showing that trial counsel was constitutionally ineffective in failing to investigate and present mitigating evidence during defendant’s sentencing hearing. In agreeing with the majority on this point, however, I do not depart from the position taken in my dissent on direct appeal that the death penalty is inappropriate in this case. See 
People v. Harris
, 182 Ill. 2d 114, 165-71 (1998) (McMorrow, J., concurring in part & dissenting in part).

As I explained in detail in my dissent on direct appeal, the character of defendant and the circumstances of his crime simply do not warrant imposition of the death penalty. Defendant was 18 years old at the time of the offense and had a minimal history of criminal behavior. The murder which defendant committed, while unquestionably senseless and tragic, was not accompanied by torture or other exceptional brutality. Further, the murder was not the product of premeditation or planning, nor was it part of any murderous spree. Instead, the murder was an impulsive act, “committed at the instigation of a friend after seeing a film glamorizing carjacking.” 
Harris
, 182 Ill. 2d at 169 (McMorrow, J., concurring in part & dissenting in part). In sum, the record in this case establishes that defendant was “susceptible to a cohort’s influence, that he was immature, impressionable, and reckless” but that he is not a hardened criminal deserving of death. 
Harris
, 182 Ill. 2d at 168 (McMorrow, J., concurring in part & dissenting in part). The post-conviction exhibits cited by the majority in support of its decision to remand this matter for an evidentiary hearing (see slip op. at 22) serve only to confirm this conclusion.

“The death penalty should be reserved for the most dangerous and incorrigible criminals–the ‘worst’ criminals. Foolishness, susceptibility to peer influence, immaturity, impressionability, and recklessness by an 18-year-old, taken individually or collectively, should not render a defendant one of society’s ‘worst’ criminals, for whom the death penalty is appropriate. The deterrent and retributive purposes of the death penalty are not served by its imposition in this case.” 
Harris
, 182 Ill. 2d at 168 (McMorrow, J., concurring in part & dissenting in part). I therefore dissent from that portion of the majority opinion which remands this cause for an evidentiary hearing on defendant’s claim of ineffective assistance of counsel. I would remand this case for the imposition of a sentence other than death.

JUSTICE KILBRIDE, also concurring in part and dissenting in part:

I agree with the majority’s judgment to allow, at minimum, an evidentiary hearing on defendant’s claim of ineffective assistance of counsel. I further agree, in part, with Justice McMorrow’s conclusion that the death penalty is inappropriate in this case for the reasons stated in her dissent on direct appeal. See 
People v. Harris
, 182 Ill. 2d 114, 165-71 (1998) (McMorrow, J., concurring in part and dissenting in part). Nevertheless, for the reasons set forth in my dissents in 
People v. Hickey
, No. 87286, slip op. at 39-43 (September 27, 2001) (Kilbride, J., dissenting), and 
People v. Simpson
, No. 85084, slip op. at 35-38 (September 27, 2001) (Kilbride, J., dissenting), I maintain that defendant’s convictions and sentence should be set aside because the trial court proceedings were not conducted in accordance with the new supreme court rules governing capital cases. The procedures in capital cases prior to this court’s adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant’s constitutional rights. Consequently, since the new rules were promulgated to address the deficiencies of constitutional dimension that regularly occurred under the old system, those rules must be applied retroactively to all capital cases currently pending on appeal before this court. See 
People v. Caballero
, 179 Ill. 2d 205, 220-21 (1997).

FOOTNOTES
1:     
1
We do not decide, however, whether a meritorious 
Apprendi
 issue is cognizable in a post-conviction proceeding, “
i.e.
, whether 
Apprendi
 applies retroactively to cases on collateral review.” 
Rogers
, 197 Ill. 2d at 224.